UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| BRIAN K. SIDES,                    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| v.                                 ) | |
| )    03-2118 | |
| CITY OF CHAMPAIGN, A Municipal     ) | |
| Corporation; FREDRICK STAVINS,     ) | |
| City Attorney; RHONDA OLDS, Assistant ) | |
| City Attorney; RANDALL CUNNINGHAM, ) | |
| Champaign Police Officer; JOSEPH   ) | |
| KETCHEM, Champaign Police Officer; ) | |
| and COLBY OLESON, Champaign Police ) | |
| Officer,                           ) | |
| ) | |
| Defendants.   ) | |

## ORDER

The plaintiff, Brian K. Sides ("Sides"), filed this action on July 10, 2003. He alleges that the City of Champaign, Illinois ("the City") and several of its employees have violated his constitutional rights and committed acts in violation of state law. Sides and the defendants have filed cross-motions for summary judgment.

For the following reasons, the defendants' motion for summary judgment is granted in its entirety. The plaintiff's motion for summary judgment is denied.

## BACKGROUND

On the afternoon of July 10, 2001, Sides and a female passenger were inside Sides' car, which was parked behind the Champaign Target store. Target security personnel monitoring surveillance cameras observed, and videotaped, through the windshield of the car, Sides engaging in sexual activity, or simulated sexual activity, with his female passenger. A Target employee contacted METCAD, and Champaign police officers responded to the call. By the time police officers arrived, Sides had driven to the Borders parking lot across the street from the Target store. Defendant Randall Cunningham ("Cunningham"), a Champaign police officer, arrived at the Borders parking lot, approached the car, and directed Sides to step out of the vehicle. Defendant Colby Oleson ("Oleson"), also a Champaign police officer, approached the

passenger side of the vehicle and questioned Sides' passenger.[1]  Sides was released after Cunningham issued him a notice to appear in court on an ordinance violation for public indecency by engaging in the specific offense of sexual intercourse.

Sides alleges that during his detention (which he claims was unreasonable) the officers (1) unreasonably searched him and seized his wallet; (2) committed the common law torts of assault and battery, trespass to chattel and invasion of privacy; and (3) were deliberately indifferent to Sides' physical and medical needs when they conducted the hour-long interrogation on that hot July afternoon.  He also alleges that officer Dale Rawdin defamed him when he yelled in the Borders parking lot that Sides had had unconsensual sex with a minor.[2]  Sides also alleges that the officers violated the Equal Protection Clause of the United States Constitution by issuing a citation only to him and not to his female passenger.  Sides alleges that the City, through defendants Fredrick Stavins ("Stavins") and Rhonda Olds ("Olds"), prosecuted him for the ordinance violation contrary to the *ex post facto* provision of the United States Constitution.  He also claims that Stavins and Olds maliciously prosecuted him by committing improprieties during the underlying trial of the ordinance violation.[3]

## ANALYSIS

Five motions are pending: a motion to bar the plaintiff's expert [#76]; the defendants' motion for summary judgment [#81]; Sides' motion for summary judgment [#83]; an emergency motion to stay proceedings for Red Cross deployment [#114]; and a motion to stay the case pending state court proceedings [#115].

I.
A.

The emergency motion to stay proceedings for Red Cross deployment is accompanied by Sides' affidavit.  Sides sought to stay the proceedings for a period of three weeks in October while he provided volunteer disaster assistance for the Red Cross in Washington, D.C.  Sides has not sought to extend his motion; therefore, the motion to stay proceedings [#114] is moot.

B.

The basis for the motion to stay proceedings pending state court proceedings [#115] is Sides' pending appeal of a state court ruling that allowed the defendants to remove from the

---

[1] Sides contends that defendant Joseph Ketchem ("Ketchem") was at the Borders parking lot, and Ketchem operated the video equipment when Sides viewed the video.  Sides alleges that Ketchem participated in a conspiracy with the other defendants.  However, he has not submitted any evidence to support his conspiracy theory.

[2] Rawdin was not named as a defendant; there is no claim pending against him.

[3] Sides has abandoned his claim of defamation against Stavins and Olds.  Sides Dep. p. 41.

Champaign County Circuit Clerk's files the original videotape of his activities next to the Target loading dock and in the Border's parking lot. The defendants submit the videotape as an exhibit in support of their motion for summary judgment. The defendants have provided Sides with a copy of the videotape.

In support of their argument, Sides and the defendants cite *Green v. Benden*, 281 F.3d 661, 666 (7th Cir. 2002). "The *Younger* abstention doctrine requires federal courts to abstain from enjoining ongoing state proceedings that are (1) judicial in nature, (2) implicate important state interests, and (3) offer an adequate opportunity for review of constitutional claims, (4) so long as no extraordinary circumstances exist which would make abstention inappropriate." *Green*, 281 F.3d at 666.

In his appeal, Sides argues that the exhibit's chain of custody has been destroyed and the defendants' unfettered access to the original videotape has left it vulnerable to tampering. Therefore, he seeks an order from the state appellate court for the defendants to return the tape to the Circuit Clerk, refile it as part of the ordinance violation case, have the videotape verified in that court, and copied for use in this case. Sides states that he does not seek to limit this court's review of the tape but only seeks to protect the proceedings by forcing proper procedure upon the defendants. He does not argue that the videotape has been altered in any way; he merely challenges the procedure used by the defendants to provide this exhibit in support of their motion.

Even if this court were to agree with Sides that the first three elements of *Younger* abstention are met, he cannot meet the fourth element of the test. The circumstances of this case make abstention inappropriate: proceeding to trial in this case will not interfere in any way with the state appellate court's determination of the narrow issue on appeal. The videotape is relevant to the issues before this court, and Sides does not contend that the videotape has been altered in any way. Furthermore, the appellate court, upholding Sides' conviction, described some of the content of the videotape and further noted that Sides had not objected to the videotape's chain of custody. *City of Champaign v. Sides*, 810 N.E.2d 287, 296 (Ill. App. Ct. 2004). Of course, the chain of custody at issue then was different from the chain of custody now at issue. However, as discussed more fully below, this court has relied on the content of the videotape only insofar as it is consistent with the images described by the state appellate court when the chain of custody was not at issue. *See, e.g., Sides*, 810 N.E.2d at 295.

Proceeding with this case will in no way interfere with the appeal of the circuit court's ruling on the defendants' possession of the original videotape. Therefore, the court denies Sides' motion to stay proceedings pending state court proceedings [#115].

II.

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is proper when "a party . . . fails to make a showing

3

sufficient to establish the existence of an element essential to that party's case[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court must consider the evidence in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The burden of establishing that no genuine issue of material fact exists rests with the movant. *Jakubiec v. Cities Serv. Co.*, 844 F.2d 470, 473 (7th Cir. 1988).  Once the movant has done so, the party opposing the motion bears the burden to respond, not simply by resting on the pleadings, but by affirmatively demonstrating that there is a genuine issue of material fact for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-324.

In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must *show* what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (emphasis added). "If [the non-movant] does not [meet his burden], summary judgment, if appropriate, shall be entered against [the non-movant]."  *See* Fed. R. Civ. P. 56(e).

The first few issues before the court relate to the legitimacy of the municipal ordinance under which Sides was prosecuted.

### A.  The plaintiff's expert

Sides has e-filed the report of his expert, Dr. James F. Castor [#64].  The defendants have filed a motion to bar Dr. Castor's testimony [#76], characterizing his opinions as legal conclusions.  Sides bears the burden to prove that the proposed testimony meets the requirements set forth below.  *See Frey v. Chicago Conservation Ctr.*, 119 F. Supp. 2d 794, 797 (N.D. Ill. 2000).

Dr. Castor discusses the validity of Table I, Ordinance Violations Minimum Fines ("Table I") of the Champaign Municipal Code, under which Sides was fined.  Sides contends that Table I had expired at the time of his citation; the City Council never passed a new ordinance revising Table I to increase the fine for public indecency to $175, and the ordinance provisions that purport to assess the $175 fine "were simply made up by the defendants as know [sic] council bills are in existence which grant authority for this change in the Code."   Dr. Castor generally supports this conclusion.

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the Supreme Court established a two-part inquiry for assessing expert testimony.  The *Daubert* inquiry is applied to all proffered expert testimony, whether scientific, technical or specialized in nature. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  The *Daubert* framework measures both the reliability and the relevance of the expert testimony.  Expert testimony is admissible if the "expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.  The first prong tests the reliability of the testimony, and the second prong tests the relevance of the testimony. *See Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420 (7th Cir. 2005).

I. Reliability

First, the court must identify the relevant analysis and focus its inquiry on whether the expert's testimony is reliable. *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004). That is, the court "must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002). *Daubert* sets out four factors when weighing reliability: (1) whether the expert's technique or theory has been tested; (2) whether it has been subjected to peer review; (3) its known or potential error rate; and (4) whether it enjoys general acceptance within the relevant community. *Daubert*, 509 U.S. at 593-94.

Courts must be flexible in their application of *Daubert*. The 2000 Advisory Committee's Notes to Federal Rule of Evidence 702 suggest additional benchmarks for gauging expert reliability, including: (1) whether "maintenance standards and controls" exist; (2) whether the testimony relates to "matters growing naturally and directly out of research [the expert has] conducted independent of the litigation," or developed "expressly for purposes of testifying"; (3) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (4) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (5) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (6) "[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." Fed. R. Evid. 702 advisory committee's note (2000 amends.); *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534-35 (7th Cir. 2005).

Dr. Castor has a B.S. degree in law enforcement administration and sociology from Western Illinois University. He obtained his M.A. in criminal justice and a Ph.D. in public policy analysis from the University of Illinois at Chicago. His doctoral dissertation is titled "Assessing the Functional and Constitutional Implications of Private Security Patrols on Public Streets." Dr. Castor states that the public policy curriculum includes how a bill becomes law, and how legislation relates to larger public policy goals. He also obtained a J.D. from John Marshall Law School. Dr. Castor's education and professional background focus on public safety and security issues. He has served as a plaintiff's expert witness in two cases and has served as a consulting expert for an engineering firm; in all three instances, his expertise related to security issues.

There is no indication that Dr. Castor possesses specialized knowledge on the enactment of municipal ordinances. His area of expertise is focused on police, security and terrorism issues, not on municipal legislation. The area at issue does not "grow naturally and directly out of research" Dr. Castor has "conducted independent of the litigation." His limited education in the enactment of legislation does not appear to be concentrated in municipal legislation. He has "extrapolated" his general knowledge of the process of legislative enactment to this particular situation and reached "an unfounded conclusion."

Moreover, Dr. Castor does not account for the "obvious alternative explanation." The fines in Table I increased automatically on July 1, 2003. Section 1-24(h) of the Municipal Code

5

states: "Effective July 1, 1999, and every two (2) years thereafter on July 1, the minimum fine set forth in Table I shall be increased automatically by the amount of ten dollars ($10.00) unless the City Council, by ordinance, delays the effective date of such increase. The City Clerk shall on or after July 1 of any such year cause a new Table I to be codified." Nowhere in his expert report or in his affidavit does he claim that Section 1-24(h) was improperly enacted. Dr. Castor simply determined that the amendments he reviewed did not amend the Table I fine for public indecency.[4] For these reasons, his testimony is unreliable.

## II. Relevance

In addition, Dr. Castor's testimony would not assist the trier of fact. Because of his failure to account for the "obvious alternative explanation" Dr. Castor's testimony fails to satisfy the second part of the Daubert framework – relevance. The plain meaning of the relevant sections of the Municipal Code is easily understood by a layperson. Table I, provided by the plaintiff, specifically states that it is "effective July 1, 2001 through June 30, 2003." Sides was cited for public indecency on July 10, 2003, ten days after the effective date of the automatic increase. The Municipal Code required the City Clerk to publish the new Table I on *or after* July 1, 2003. That the City Clerk had not yet published a new table of fines when Sides was cited is irrelevant;[5] it was well established that the fines would increase by $10 on July 1, 2003. An expert in municipal ordinance enactment is not needed when the court can interpret the Municipal Code according to its plain meaning.

Consequently, the motion to bar the plaintiff's expert [#76] is granted.

---

[4] One of the amendments reviewed by Dr. Castor allowed for public service work in lieu of the published minimum fines. Another amendment related to the fine for possession of drug paraphernalia. Sides and Dr. Castor correctly assert that these amendments had nothing to do with the minimum fine for public indecency. The relevant inquiry, however, is the enactment of the automatic increase provision of Section 1-24(h). Dr. Castor's report is silent on this issue.

[5] Sides makes much of the fact that at the underlying trial, the prosecuting attorney stated that Sides "unfortunately caught us on the change-over from the old table to the new table." The prosecutor undoubtedly referred to the issuance of a new Table I to reflect the increased fines. That the City had not yet published a new Table I before Sides was cited for public indecency does not invalidate the increase in the fine; the relevant date is the effective date of the increase.

B. *Ex post facto* violation

Sides claims that the City prosecuted him for an ordinance violation that was not published law at the time of the offense. He further claims that Stavins and Olds conspired to violate his civil rights at trial and on appeal by falsely arguing that the ordinance was published law. He argues this violates the *ex post facto* provision of the United States Constitution. U.S. Const. art. I, § 9, cl. 3. It does not.

To fall within the *ex post facto* clause, a "law must be retrospective, that is, it must apply to events occurring before its enactment; and ... it must disadvantage the offender affected by it." *Glascoe v. Bezy*, 421 F.3d 543, 546 (7th Cir. 2005) (*quoting Miller v. Florida*, 482 U.S. 423, 430 (1987). As discussed above, Section 1-24(h) of the Municipal Code provides for an automatic increase of $10 in the minimum fines beginning July 1, 1999 and on July 1 every two (2) years thereafter. On or after the effective dates of the automatic increases, the City Clerk issues a new Table I. Nothing in the ordinance or the process itself suggests that the new fines cannot be applied until the new Table I is published. On the contrary, Section 1-24(h) specifies that the new fines *are effective* on July 1, and that *on or after* that date, the City Clerk must publish a new Table I. The increase in minimum fines did not apply to events occurring before its effective date; Sides violated the ordinance on July 10, 2001, ten days *after* the effective date of the increase. There was no *ex post facto* violation because the new table of fines was effective nine days before Sides violated the ordinance.

C. Detention, search and seizure

I.

In his complaint, Sides contends that the officers lacked legal justification to detain him, and/or that he was detained for an unreasonable duration and under unreasonable circumstances given the weather conditions.

First, Sides argues that the officers lacked legal justification to detain him. "A law enforcement officer may conduct a brief, non-intrusive detention of a person if the officer has specific and articulable facts sufficient to give rise to a reasonable suspicion that the person had committed or is committing a crime." *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (*citing Terry v. Ohio*, 392 U.S. 1, 26 (1968); *United States v. Scheets*, 188 F.3d 829, 837 (7th Cir. 1999). At his deposition, Sides did not dispute that officers had been advised that he had engaged in some type of sexual activity behind the Target store,[6] and he admitted or acknowledged there was a videotape showing that he was engaged in some type of sexual activity behind the Target store. The officers had a reasonable suspicion to detain Sides.

"A court considering the reasonableness of a particular detention's duration must 'examine whether the police diligently pursued a means of investigation that was likely to

---

[6] Sides Dep. pp. 13-14.

confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Scheets*, 188 F.3d at 838 (*quoting United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994); *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). The defendants have submitted METCAD records documenting the stop. Officers arrived on the scene at 1:31 p.m. The officers ascertained Sides' identity, ran a check on his drivers license, questioned Sides[7] and his female passenger, went to the Target store to view and/or obtain the surveillance video, and issued a citation. METCAD received a "clear call" at 2:34 p.m. The length of Sides' detention was not unreasonable under the circumstances.

II.

Sides also contends that the officers were deliberately indifferent to his serious physical and medical needs due to prolonged exposure to the heat. The Due Process Clause protects arrestees from deliberate indifference to a serious injury or medical need. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). To prevail, Sides must satisfy an objective and a subjective element. He must show (1) an objectively serious injury or medical need was deprived; and (2) the officers knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it. *Chapman*, 241 F.3d at 845. Sides contends that the hot July weather caused him to experience dizziness and dehydration, which he repeatedly mentioned to the officers. He further states that four or five hours after his detention his buttocks were sore, inflamed and red because he had leaned against the fender of his running car. After his release, he took aspirin and had aloe applied to the affected area. The physical symptoms disappeared within forty-eight hours. Several years later, he retained the services of an expert, a physician, to whom Sides described his symptoms. The physician apparently opined that the symptoms Sides described were caused by the events of the day.[8] Sides' claim fails on several levels. His physical need, if any, was not objectively serious; Sides was detained for approximately one hour and thereafter did not seek medical assistance on his own. Moreover, his allegation of injury is unsupported by evidence other than his say-so.[9] He has failed to meet his prima facie burden on this issue.

III.

Sides also contends that he was subjected to an unreasonable search and seizure that also constitutes an assault and battery, trespass to chattel and invasion of privacy. Ordinance violations are quasi-criminal in nature. *City of Danville v. Clark*, 348 N.E.2d 844, 845 (Ill. 1976).

---

[7] It is not known how long the questioning took; however, Sides admits he repeatedly asserted his Fifth Amendment privilege in response to the officers' questions about what had transpired behind the Target store. Sides Dep. p. 19. Under the circumstances, the questioning probably took a bit of time.

[8] The expert's report has not been submitted to the court.

[9] Cristina Manuel's affidavit does not mention any physical effects suffered by the plaintiff during his detention or afterward. *See* docket entry #86.

Officers who have probable cause to arrest a suspect may conduct a pat-down search.[10]  *United States v. Jackson*, 377 F.3d 715, 716 (7th Cir. 2004).  Sides contends that he rolled down his window and handed Cunningham his drivers license when Cunningham approached the car. Later during his detention, Sides alleges, officer Dale Rawdin unreasonably pinned Sides' arm behind his back, searched his person, removed a wallet, and perused the contents without probable cause.[11]  The officers responded to a call regarding unlawful conduct involving sexual activity; they were given the vehicle location, description and license plate.  When the officers located the vehicle, they noted a man and woman inside the vehicle.  The officers had probable cause to justify a pat-down.  Moreover, even if the search and seizure were unlawful, it was Rawdin who committed the violation, and he is not named as a defendant.[12]  Therefore, Sides cannot prevail on this issue.

### D.  Equal protection violation

Sides contends that the defendants cited him for public indecency by sexual intercourse, an act that cannot be committed without a second individual; yet, his female passenger was not cited for her conduct.  He argues that the defendants' selective enforcement of the ordinance amounts to a violation of the Equal Protection Clause.  U.S. Const. amend. XIV.  An officer has discretion in the enforcement of an ordinance or statute.  *Oyler v. Boles*, 368 U.S. 448, 456 (1962).  Deliberate selective enforcement of a statute does not rise to the level of a constitutional violation unless "the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."  *Oyler*, 368 U.S. at 456.

At his deposition, Sides was questioned, and he answered, as follows.

Q.  You admit now that you were engaged in sexual intercourse behind the Target store; correct?

A.  No, I do not.  I admit that I was found guilty of it.

Q.  What was it that you were doing behind the Target store?

A.  I was gratifying myself before my partner at that time, Christina Manual.

Q.  So you were masturbating?

---

[10] The pat-down is permitted to ensure the officer's safety and/or preserve evidence. *Jackson*, 377 F.3d at 717.

[11] Cunningham states that Sides was uncooperative and unresponsive to questioning and repeatedly placed his hands in his pockets despite being told not to.  Rawdin then placed Sides in a control hold for officer safety, patted him down and removed his wallet for identification purposes. Cunningham Aff. ¶¶ 4, 5.

[12] Sides Dep. p. 40 ("I think the only time I was physically restrained was on my right arm by Mr. Rowden [sic] during the search that was discussed earlier.")

A. I don't think that's an inaccurate description.

Q. What would be more accurate?

A. That I was gratifying myself before my partner at the time, Christina Manual.

Q. By engaging in what type of activity?

A. I think masturbation.

Q. Why do you think that Christina admitted to the police officers at the scene that you were actually having sexual intercourse?

A. If you mean – it's my understanding that never happened at all. It's my understanding that she was asked if you two were having sex, you two meaning myself and Christina, and I believe that she probably may have answered in the affirmative.

Q. Okay.

A. She was not entirely clothed and neither was I.[13]

No reasonable jury could conclude the officer's conscious exercise of selectivity in enforcement was based on an unjustifiable standard. *See Oyler*, 368 U.S. at 456. The surveillance video shows a woman in the car with Sides. The Illinois Appellate Court succinctly stated, "[Sides] was the only person whose naked buttocks are visible in graphic motion as memorialized on the videotape. [Sides] and his sexual partner were not similarly situated." *Sides*, 810 N.E.2d at 295. Indeed, the officers' decision was well supported by the images on the surveillance video, a decision further strengthened by the corroborative statement of Sides' female companion during questioning.

### E. Unlawful assistance from the State's Attorney's Office

The defendants have moved for summary judgment on Sides' claim that defendant Olds received improper assistance from the Champaign County State's Attorney's Office during the trial of his ordinance violation. At his deposition, Sides stated that an assistant state's attorney sat in the back of the courtroom and either assisted Olds or gave Sides a hard time. The Illinois Appellate Court characterized Sides' argument as a contention that the City "'was receiving additional assistance, off the record, and outside the presence of the jury.'" *Sides*, 810 N.E.2d at 301. Sides claims this assistance amounts to "second-chairing."

The assistant state's attorney did not sit at the counsel table, but during one recess she passed through the gallery doors into the counsel area to confer privately with Olds. Sides does

---

[13] Sides Dep. pp. 13-14.

not know what the conversation was about.  The county employee also allowed Olds to borrow an evidence treatise from the State's Attorney's Office.  Sides felt the county employee harassed him during recesses.  At his deposition, he stated, "That's what I remember most.  Because it probably frustrated me the most."[14]  He claimed her involvement diverted his attention.  Sides agrees she never made any representations to the court or the judge, and Sides does not recall whether she provided any assistance in the preparation of direct or cross-examination, helped to formulate opening remarks or closing statements, or provided any legal authority for any positions the City had taken, other than to provide a copy of the treatise.  The appellate court found Sides' arguments unpersuasive, noting, "It is not prejudicial for opposing counsel to consult with another attorney."  *Sides*, 810 N.E.2d at 301.  This court concurs, and sees no need to review the issue.

F.  Defendants' prosecutorial misconduct

The defendants also move the court for summary judgment on Sides' claim that Stavins and Olds made false representations to the circuit court, failed to comply with discovery requests for an officer's handwritten notes, used trickery to amend the ordinance violation complaint to alter an element of the offense, and did so with malice or ill will.  These issues were raised in, and rejected by, the circuit court.  This court specifically declines to second-guess the circuit court's rulings on matters that properly belong within the state's jurisdiction.  This court is ill-equipped to judge the assertions and credibility of counsel in the underlying case.

CONCLUSION

For the foregoing reasons:

(1) the plaintiff's emergency motion to stay proceedings for Red Cross deployment [#114] is denied as moot;
(2) the plaintiff's motion to stay pending state court proceedings [#115] is denied;
(3) the defendants' motion for an order to bar the plaintiff's expert [#76] is granted;
(4) the defendants' motion for summary judgment [#81] is granted in its entirety; and
(5) the plaintiff's motion for summary judgment [#83] is denied in its entirety.

The final pretrial conference now scheduled for December 6, 2005 at 1:30 p.m. is vacated.  This case is terminated.  The parties shall bear their own costs.

Entered this 5th day of December, 2005.

s/Harold A. Baker
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE

---

[14] Sides Dep. p. 33.